STATE of Tennessee, Appellee,

v.

Dwike Keith McMILLER, Appellant.

Court of Criminal Appeals of Tennessee, at Knoxville.

Jan. 8, 1981.

Supreme Court Denied Permission to Appeal March 16, 1981.

Thomas D. Frost, Dillow, Minor & Frost, Kingsport, for appellant.

William M. Leech, Jr., Atty. Gen., William P. Sizer, Asst. Atty. Gen., Nashville, Carl K. Kirkpatrick, Dist. Atty. Gen., Blountville, H. Greeley Wells, Asst. Dist. Atty. Gen., Blountville, for appellee.

## OPINION

SCOTT, Judge.

The appellant was convicted of aggravated rape and received a sentence of twenty-five years in the state penitentiary. He was also convicted of attempt to commit a felony and sentenced to not less than one nor more than two years in the state penitentiary. Finding him to be an habitual criminal, the jury enhanced the punishment for the aggravated rape conviction to life imprisonment. The attempt to commit a felony sentence was ordered to be served concurrently with the life sentence. Aggrieved by these actions, the appellant has presented seven issues for our review.

The first two issues, taken together, constitute the standard issue, challenging the sufficiency of the evidence.

In the early morning hours of August 10, 1979, the victim returned from an evening of night clubbing to her apartment in the Cloud Apartments complex in Kingsport. She went directly to bed and was soon asleep. Later, she was awakened by the movement of the cover on her bed. She saw a black man stooped over her bed. Street lights outside her bedroom window provided illumination and she saw his face. He instructed her to turn away from him and he subsequently tied one of her flannel nightgowns around her face. The man was armed with a shiny, sharp-bladed object which the victim believed to be a knife.

The man instructed her to remove her nightgown and he then removed her panties. He penetrated her from three different positions. As he did so, he stuck the sharp blade of the object against her shoulder. Eventually, he climaxed and got up from the bed. The man then got a wet washcloth and made the victim wash her genitals.

After instructing the victim not to call the police but to remain in her bed under a threat that he would kill her if she did not comply, the man left. She remained in the bed and lay very still. Shortly he returned to the bedroom to determine if she was following his instructions. He told her, "if I hear one word about rape in these apartments tomorrow, I'll know where it came from". He further told her that if she reported the matter that she would be killed.

The man departed again and the victim again lay very still for an extended period of time. When she heard movement in her next door neighbor's apartment, she went out onto the porch and talked with the neighbor. She did not tell the neighbor about the incident, since, according to the victim, she was afraid to do so.

After daybreak, she walked to her sister's apartment located in the same complex, where she told her sister and her brother-in-law about the incident. In spite of the statements about her fear of retaliation, the brother-in-law called the police.

Officers responded and carried the victim to a hospital where a doctor performed a pelvic examination. The examination revealed the presence of sperm inside and outside the vagina. An acid phosphatase test revealed that the victim had recently had sexual intercourse.

The police showed the victim an album of black and white mugshots of black men. The appellant's photograph was not in the album and she did not identify anyone. Three days later the victim looked through an album of color photographs of black men. Two photographs of the appellant were included therein, one with a beard and one without. The victim identified both photographs as being accurate representations of the man who raped her. She also made an unequivocal, in-court identification of the appellant.

The appellant lived with his girlfriend, Sarah Ann Ford, in the same apartment complex. Ms. Ford was an employee of the Kingsport Housing Authority in the maintenance department. She had a master key to all of the apartments in the complex.

The appellant was also placed on the scene at about the time of the rape by Howard Lark, Jr., another resident of Cloud Apartments. Mr. Lark became restless and could not sleep, so he went outside at approximately 3:00 or 4:00 A.M. He ran into the appellant and together they smoked a joint of marijuana and chatted. The appellant identified himself as "Skeets" McMiller's brother and told Mr. Lark that his nickname was "Rusty". Mr. Lark described the appellant's dress as a black, short-sleeved, football jersey with white stripes around the shoulders and numbers on the front and back. He wore cut offs and was barefoot. The victim had also stated that her assailant was wearing a black football jersey with white numerals. Neither Mr. Lark nor the victim could identify precisely the numbers on the jersey.

The appellant admitted his presence in the apartment complex during those early morning hours. He contended that he had been out to a club earlier in the evening and that he and Ms. Ford had been to someone else's apartment to watch a movie on T.V. They returned to her apartment and continued to watch television until 3:00 or 3:15 A.M. He then went outside where he met Mr. Lark. He admitted that they smoked a joint together, that he told him he was Skeets' brother, and that he told him that his nickname was "Rusty". However, he denied the rape, denied ownership of a black football jersey, and denied ever having touched his girlfriend's master key to the apartment complex.

Based on this controverted proof, the jury found the appellant guilty. The rules for appellate review of jury verdicts have been so frequently stated that they hardly require restatement. A guilty verdict by a jury, approved by the trial judge, accredits the testimony of the witnesses for the state. The trial judge and jury are the primary instrumentalities of justice to determine the weight and credibility to be given to the testimony of witnesses. No appellate court is free to reevaluate the evidence as it pleases. Upon appeal the state is entitled

to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

Considering this case in light of these firmly established principles, we find that there was ample evidence from which a rational trier of fact could determine that the appellant is guilty beyond a reasonable doubt. Rule 13(e), T.R.App.P., *Jackson v. Virginia*, 443 U.S. 307, 312–324, 99 S.Ct. 2781, 2786–2792, 61 L.Ed.2d 560 (1979). These issues have no merit.

■ In the next two issues the appellant contends that the court erred in not granting a mistrial when the Attorney General advised the jury in his voir dire examination that the appellant did not have to testify, and also contends that the court erred in refusing to grant a mistrial when a witness identified the book of photographs as being pictures of persons who had been convicted of crimes. Actually, the witness testified that this was a book of photographs of people "arrested" for crimes not "convicted".

While these issues are presented, the appellant presented no authority from this jurisdiction or any other and presented no argument in regard to either. Therefore, both issues were waived and we hold them to be without merit. *Rockett v. State*, 475 S.W.2d 561, 563 (Tenn.Cr.App.1971).

In the next issue the appellant contends that the photographic show-up was tainted and unduly suggestive because the appellant's photograph appeared twice therein.

The proof showed that the color photograph album contained seventy-six (76) photographs of black men. The appellant voluntarily came to the police station and had a color photo made prior to the victim viewing the book. The officers were not aware that the album had another photo of the appellant therein until the victim pointed out both photographs. The record does not reveal whether any of the other men depicted in the album appeared more than once.

■ A violation of due process may occur if an identification procedure is so "suggestive" as to give rise to "a very substantial likelihood of irreparable misidentification". In deciding whether an identification procedure is suggestive, the Court must view the alleged suggestive procedure in the "totality of the circumstances". *Sloan v. State*, 584 S.W.2d 461, 466 (Tenn.Cr.App.1978), citing *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), and *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

■ We hold that the identification procedure in this case, viewed in the totality of the circumstances, was not the least bit suggestive. The fact that two photographs of the appellant were interspersed with seventy-four others in a photograph album does not indicate suggestiveness. In addition, the fact that the victim selected both photographs, which differed markedly because of the presence and absence of a beard, illustrates how absolutely positive the victim was in her identification. This issue has no merit.

■ Next, the appellant contends that the trial judge erred when he failed to charge the jury that in order to constitute the crime of aggravated rape that the victim must suffer personal injury. He bases this contention on his interpretation of TCA, § 39–3703.

Prior to the 1980 amendments, this statute provided in pertinent part as follows:

(a) Aggravated rape is unlawful sexual penetration of another accompanied by any of the following circumstances:

(1) The actor uses force or coercion to accomplish the act, and

(A) The actor is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon,

(B) The actor causes personal injury to the victim, or

(C) The actor is aided or abetted by one or more other persons.

The appellant contends that the absence of the word "or" at the conclusion of Subsection (A) makes the sections conjunctive and that both being "armed with a weapon" and "caus(ing) personal injury to the victim" are required to constitute aggravated rape. We do not believe that the General Assembly intended such an absurd result. As a matter of ordinary usage of the English language, when there is a series of three or more short independent clauses, the last of which is preceded by "or" commas are used to separate the clauses. Shaffer and Shaw, *McGraw-Hill Handbook of English*, (2d edition), p. 172. The "or" impliedly precedes each of the clauses in the series.

We find that the legislature intended to use English in the ordinary fashion, that Subsections (A), (B), and (C) of TCA, § 39–3703(a)(1) are disjunctive, and that the presence of any one of those three elements in conjunction with force or coercion to accomplish the act is sufficient to constitute the crime of aggravated rape. This issue has no merit.

Finally, the appellant contends that the enhancement of his punishment by finding him to be an habitual criminal was illegal, since "aggravated rape" is not included in the class of crimes which can properly be used as a triggering offense under the habitual criminal statute.

TCA, § 40–2801, defines an habitual criminal as one who has been convicted of three felonies, not less than two of which are among those specified in various statutes incorporated by reference in the cited section. Among the referenced code sections is TCA, § 40–2712, the infamy statute. Among the offenses therein listed as infamous crimes and therefore supportive of an habitual criminal conviction is "rape".

The definition of "rape" previously found at TCA, § 39–3701, is "the unlawful carnal knowledge of a woman, and against her will. Carnal knowledge is accomplished by the commencement of a sexual connection." Penetration is an essential element of this offense. *Greene v. State*, 210 Tenn. 276, 358 S.W.2d 306, 307 (1962).

In support of his position, the appellant relies on *Evans v. State*, 571 S.W.2d 283 (Tenn.1978). In that case the Supreme Court held that, "crime against nature" prohibited by TCA, § 39–707, which has been interpreted as including several oral sexual acts, could not be used as a triggering offense. TCA, § 40–2712, lists "sodomy" and "buggery" as infamous crimes and therefore triggering offenses under the habitual criminal statute. Although these terms have, over the years, had broad definitions, the Supreme Court held that "sodomy" is "anal copulation between humans", while "buggery" is the "copulation of a human with an animal". Therefore, the Supreme Court held a "crime against nature" conviction was too broad to support a conviction for being an habitual criminal.

The proof in this case clearly revealed that the aggravated rape was a sexual penetration of a woman through force or coercion and against her will. This was unlawful carnal knowledge of her, accomplished by an aggravating circumstance set forth in the new statute, to-wit: the appellant was armed with a weapon or an article used or fashioned in a manner to reasonably lead the victim to believe it to be a weapon. TCA, § 39–3703(a)(1).

We hold that under the circumstances of this case that "aggravated rape" of a woman is "rape" for purposes of TCA, § 40–2712. It is, therefore, a triggering offense for habitual criminality, pursuant to TCA, § 40–2801.

We commend this entire matter to the General Assembly for the purpose of clarifying the habitual criminal statutes in light of the new sexual offenses law of 1979 as amended. TCA, § 39–3701 et seq.

Finding no merit to any of the issues presented by the appellant, the judgment is affirmed.

O'BRIEN and CORNELIUS, JJ., concur.